UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

RHONDA MOLEN,                    :        Case No. 3:12-cv-286
                                 :
         Plaintiff,              :        Judge Timothy S. Black
                                 :
vs.                              :
                                 :
COMMISSIONER OF                  :
SOCIAL SECURITY,                 :
                                 :
         Defendant.              :

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND
SUPPORTED BY SUBSTANTIAL EVIDENCE, AND AFFIRMED;
AND (2) THIS CASE IS CLOSED**

This is a Social Security disability benefits appeal.  At issue is whether the

administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and

therefore unentitled to supplemental security income ("SSI") and disability insurance

benefits ("DIB").  (*See* Administrative Transcript at Doc. 6 ("PageID") (PageID 90-101)

(ALJ's decision)).

**I.**

Plaintiff filed applications for DIB and SSI on December 5, 2008.  (PageID 208-

218).  Plaintiff alleged a disability onset date of May 14, 2007 due to a back injury and

anxiety.  (PageID 208, 216, 243).  Plaintiff applied for Widow's or Widower's Insurance

Benefits on June 5, 2009.[1]

Plaintiff's applications were denied initially and upon reconsideration.  (PageID 148-152, 156-159, 164-167).  Plaintiff requested a hearing, which was held on January 10, 2011 by an ALJ.  (PageID 108-139, 162-163).  The ALJ issued her decision on March 8, 2011, finding that Plaintiff was not disabled as defined by the Social Security Act.  (PageID 101).  The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  (PageID 59-62).  Plaintiff then commenced this action in federal court for judicial review of the Commissioner's decision pursuant to 42 U.S.C. Section 405(g).

The ALJ determined that Plaintiff did not have an impairment or a combination of impairments that met or equaled the Listing of Impairments.  (PageID 95).  The ALJ found that Plaintiff had the residual functional capacity to: "Perform light work…except no operation of foot controls with the left foot; only occasionally climbing ramps or stairs, but no climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching and crawling; the option to alternate sitting and standing at 15-minute intervals; simple, routine, repetitive tasks without a production rate pace or strict production quotas; no public interaction and only superficial interaction with coworkers." (Page ID 97).

---

[1]  The Social Security Act provides for the payment of Widow's Insurance Benefits ("WIB") to a disabled widow whose husband has died while fully insured.  42 U.S.C. § 402(e).  To qualify for WIB based on a disability, the widow must be unmarried, between the ages of fifty and sixty, be the spouse of a wage earner who dies fully insured, filed an application for such benefits, and be under a "disability" as defined in the Social Security Act.  42 U.S.C. § 402(e)(1).

Plaintiff is 55 years old and has one year of college.  (PageID 208, 247).

Plaintiff's relevant work includes: inventory clerk, library assistant, and bus driver.

(PageID 131-132).

The ALJ's "Findings," which represent the rationale of her decision, were as

follows:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2013 for Medicare benefits only.

2. It was previously found that the claimant is the unmarried widow of the deceased insured worker and has attained age 50.  The claimant met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act.

3. The prescribed period ends on May 31, 2016.

4. The claimant has not engaged in substantial gainful activity since May 14, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

5. The claimant has the following severe impairments: chronic back pain with history of endoscopic discectomy and decompression; anxiety disorder; and major depressive disorder (20 CFR 404.1520(c) and 416.920(c)).

6. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

7. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except no operation of foot controls with the left foot; only occasional climbing ramps or stairs, but no climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching and crawling; the option to alternate sitting and standing at 15-minute intervals; simple, routine, repetitive tasks without a production rate pace or strict production quotas; no public interaction and only superficial interaction with coworkers.

8.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

9.  The claimant was born on January 19, 1958 and was 49 years old, which is defined as a younger individual, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

10. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

11.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

12. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

13. The claimant has not been under a disability, as defined in the Social Security Act, from May 14, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 34-43).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations, and was, therefore, not entitled to SSI or DIB.  (PageID 101).

On appeal, Plaintiff argues that: (1) the ALJ erred in rejecting the opinion of Plaintiff's treating physician; and (2) the ALJ erred in failing to find that Plaintiff was credible.  The Court will address each error in turn.

**II.**

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  In performing this review, the Court considers the record as a whole.  *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled.  As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts.  If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  That is, she must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy.  42 U.S.C. § 423(d)(1)(A).

**A.**

The record reflects that:

Plaintiff was treated by Dr. Donald Turner from February 14, 2004 through January 8, 2008. (PageID 365). On November 2, 2009, he reported that she had been treated for chronic back pain, severe recurrent headaches, and routine medical conditions. He noted that he had not treated her for over a year and was unaware of her current medical condition and level of disability. (*Id.*) He submitted his office notes dated March 14, 2007 through January 2008. (PageID 459). In May 29, 2007, Plaintiff complained of back pain. (PageID 457). She had been lifting people as a part of her job duties three weeks prior and her pain had become progressively worse. (PageID 456). By December 18, 2007, she was having headaches and numbness in her arms. (PageID 454-455). On January 8, 2008, it was noted that she was seeing five different doctors to get vicodin and she was terminated from the practice. (PageID 450).

Dr. Lance Tigyer submitted his office notes dated May 22, 2007 through January 9, 2008. A June 12, 2007 lumbar MRI demonstrated a "broad left lateral disc displacement at L3-4, abutting both descending and exiting L4-L3 nerve roots…, [c]oncentric spondylotic protrusion at L4-5 abuts both exiting L4 and descending L5 nerve roots…, [and] [b]ilateral facet arthropathy with capsulosynovial inflammation …at L3-4, L4-5, and L5-S1." (PageID 619). On exams, she had positive straight leg raising test, restricted range of motion of her lumbar spine, and tenderness. (PageID 606-610, 617, 618). She was treated with lumbar epidural injections. (PageID 610, 617).

A cervical EMG, performed on September 21, 2007, was normal. (PageID 615). Cervical MRI revealed mild degenerative disc disease. (PageID 614). On November 16, 2007, Dr. Tigyer reported that all conservative treatment, including physical therapy, had failed and that Plaintiff wanted to proceed with surgery which he felt was the best course. (PageID 608). She underwent a lumbar MRI on December 28, 2007. It showed some left neural foraminial narrowing at L4-5 with some contour distortion of the left exiting L4 nerve root sleeve and a disc protrusion at L3-4 that touched the left L3 nerve root sleeve and some lateral recess stenosis that also abutted the decending left L4 nerve root sleeve. (PageID 362). He no longer felt that she would benefit from a microdiscectomy or lumbar fusion and referred her to Dr. Watson to find out if he could perform a minimally invasive procedure. (PageID 606).

Plaintiff was treated at Innovative Pain Solutions from February 2, 2008 through December 1, 2008 for ankylosing spondylitis, sacroiliitis, lumbar intervertebral disc without myelopathy, lumbosacral disc, thoracic or lumbosacral neuritis or radiculitis, and other back symptoms. (PageID 321). She was seen on February 5, 2008, at the request of Dr. Tigyer. Dr. Tigyer confirmed that she had "L3-4 through L5-S1 degenerative disc disease, disc protrusions at L4-5 and L5-S1, facet arthropathy, impingement of [l]eft L4 nerve root possibly L3 (on MRI), annular tearing of L4-5, bilateral stenosis at L4-5…" demonstrated by the December 28, 2007 lumbar MRI. (PageID 321). On exam, she had mild antalgic gait, tenderness, muscle spasm, reduced range of lumbar range of motion, decreased sensation of the left lower extremity, and positive left leg straight leg raising test. Dr. Watson stated that Dr. Tigyer "did not believe that a miscrodiscectomy or fusion would be beneficial in relieving her symptoms." (Tr. 323). However, Dr. Watson

recommended an endoscopic discectomy be performed as soon as they could obtain insurance approval.  (*Id*.)  A subsequent exam revealed that she had a reduced range of motion, tenderness, hypoesthesia, positive Faber test, muscle spasms, tenderness of her hips, left foot weakness, positive straight leg raising on the left, antalgic gait, and some limitation in range of motion of hips.  (PageID 329-330).  She underwent a May 8, 2008 endoscopic discectomy.  (PageID 333-334).  Dr. Watson stated that he was "unable…to move past the L4-5 disc to get up to the disc at L3-4 because the endoscope kept being flipped posteriorly."  (PageID 334).  He "decided not to try to do anything further at the L3-4 level because [he] could not get into good position."  (*Id*.)  By May 28, 2008, she reported a significant improvement in pain; however, she still had some low back pain and some occasional pain down the entire length of her left leg.  (PageID 338).  She was started on a physical therapy exercise program.  (PageID 339-340).  By June 11, 2008, she complained of significant pain in her back.  (PageID 341).  It worsened until it was as bad as it had been prior to the surgery.  (PageID 345, 347).  On July 22, 2008, she had an antalgic gait and tenderness.  (PageID 349).  On September 19, 2008, Plaintiff related that she had bad days and then days when the pain was not as severe.  (PageID 351).

On November 25, 2008, Dr. Watson reported that she was considered able to return to work on December 1, 2008.  (PageID 361).  Plaintiff was seen on that date and complained of middle low back pain with pain intermittently radiating down her left leg. (PageID 357).  She was also reported to be irritable and sarcastic during the exam.  She was to be weaned off her medications and there was no more interventional treatment to offer her.  (PageID 359).  However, on December 1, 2008, Dr. Watson reported that she was unable to return to work until February 1, 2009.  (PageID 360).

During the time Plaintiff was treated by Dr. Watson, she was also seeing Dr. Ohsang, her family physician, from May 8, 2008 through December 3, 2008. She was treated for asthma, upper respiratory infection, anxiety, hypertension, hives, and low back pain. (PageID 307-308, 312-313). On exams, she had tendernesss of her lumbar spine. (PageID 308, 313). X-rays taken of her cervical spine on November 11, 2008 revealed a reversal of the normal cervical lordosis. (PageID 314).

Dr. James Millis, a non-examining physician, reviewed the record on February 10, 2009, at the request of the State agency. (PageID 375). He opined that Plaintiff could lift/carry up to fifty pounds occasionally and twenty-five pounds frequently. She could stand/walk for six hours out of eight and sit for six hours out of eight. (PageID 368). She frequently could perform all postural activities including climbing ladders, ropes, and scaffolds. (PageID 369).

Plaintiff was seen in the emergency room on July 12, 2008. She was seen for significant lower back pain from moving furniture when she moved to Tennessee. (PageID 478).

Plaintiff also received treatment at the Pain Center Crossville starting in January 2009. On exam, she had lumbar tenderness, decreased range of motion, slow gait, and positive straight leg raising on the right. (PageID 425-426). She also was observed to have anxiety. (PageID 425). Other exams also revealed slow gait, tenderness, and decreased range of motion. (PageID 411, 414, 418, 420). In addition to medication, she was also treated with injections. (PageID 413-412, 414-416).

On February 18, 2009, Plaintiff's electrodiagnostic testing revealed severe saphenouse nerve pathology and very severe peroneal papthology. (PageID 381). A

March 6, 2009 lumbar MRI demonstrated mild disc protrusion at L3-4, L4-5 diffuse disc bulge and small disc protrusion with some narrowing of the right neural foramen and mild facet hypertrophy as well as hypertrophy of the of the ligamentum flavum. Evidence of her back surgery did not show up on the MRI.  (PageID 383).

Plaintiff was seen in the ER on November 8, 2008 for chest pain.  (PageID 440). She had been off her Ativan for three days.  (PageID 441).  She was very anxious. (PageID 442).  She was given Ativan and became much calmer.  Her symptoms were attributed to a panic attack and possible withdrawal of her Ativan.  She was then discharged.  (PageID 443).

Dr. Talieh Hendi completed a Basic Medical form in December 2009.  She opined that Plaintiff could stand/walk for six to seven hours out of eight and uninterrupted for one to two hours.  She could sit for seven hours out of eight and uninterrupted for up to half an hour.  She could frequently and occasionally lift/carry up to five pounds. She was markedly limited in her ability to push/pull, bend, reach, and handle.  She was unemployable for twelve months or more.  (PageID 528).

On June 3, 2010, Plaintiff had positive straight leg raising test, decreased range of motion, tenderness, and muscle spasms.  (PageID 519).  She had some sensory loss of her left low extremity, decreased range of motion, tenderness, and muscle spasm in July 2010.  (PageID 545).  She could not afford to see a neuro surgeon.  (PageID 544).  Dr. Hendi observed that she was depressed on August 6, 2010.  (PageID 543).

On June 9, 2010, Dr. Hendi completed interrogatories.  Dr. Hendi is an internal medicine specialist who had treated Plaintiff since July 1, 2009.  (PageID 532).  Her diagnoses included chronic back pain, status pain surgery; hypertension; anxiety, and

depression.  (PageID 533).  She opined that Plaintiff could frequently lift/carry one to two

pounds and occasionally lift/carry one to five pounds because of her severe back pain and

she was status post-surgery.  (PageID 622- 623).  Plaintiff could not relate predictably in

social situations because she was "not good in social situations."  (PageID 537).  She

could stand/walk for two hours out of eight and uninterrupted for two hours owing to her

back pain and status post back surgery.  She could sit for one to four hours out of eight

and uninterrupted for one to four hours, again, owing to her back pain and status post

surgery.  (PageID 623).  She was not reliable.  (PageID 537).  She could occasionally

climb.  Her ability to push/pull was also affected.  (PageID 624).  She was restricted from

heights, moving machinery, dust, noise, fumes, humidity, and vibration as a result of her

asthma, anxiety, and pain.  She had severe anxiety that made her unable to tolerate noise.

(PageID 625).  She was unable to perform even sedentary work activity.  (PageID 626).

She could not maintain attention and concentration for extended periods of time; perform

activities within a schedule, maintain regular attendance and be punctual within

customary tolerances; complete a normal workday or workweek without interruptions

from psychologically and/or physically based symptoms and perform at a consistent pace

without unreasonable numbers and length of rest periods; respond appropriately to

changes in a routine work setting; get along with co-workers or peers without unduly

distracting them or exhibiting behavior extremes; sustain ordinary routine without special

supervision; work in coordination with, or in proximity to, others without being unduly

distracted by them; accept instructions and respond appropriately to criticism from

supervisors.  (PageID 538-540).  She had a marked impairment in her daily activities,

social functioning, concentration, persistence, or pace.  (PageID 540-41).

Plaintiff started treatment with Dr. Joseph Allen, a family physician, on November 11, 2010. (PageID 596). She had decreased range of motion of her lumbar spine and tenderness on exam. (PageID 600).

Dr. Benjamin Gilliotte evaluated Plaintiff on December 1, 2010. (PageID 628). Dr. Gilliote observed that she was depressed, had some problems with heel and toe walking, had decreased range of motion of her lumbar spine, had diminished sensation and mild loss of strength of her lower left extremity, diminished reflexes, positive Patrick's maneuver, positive straight leg raising test, and tenderness. The diagnosis was chronic low back pain. She was prescribed gabapentin and given a lumbar support brace. (PageID 629). A January 21, 2011 lumbar MRI revealed some lumbar lordosis and retrolisthesis at L4 on L5 and L5 on S1; mild disc desiccation and disc space narrowing at L4-5, L3-4, and L5-S1; some disc narrowing and diffuse bulging disc at T11-12; small disc tear on the left at L3-4 with moderate hypertrophy of the facet joints; mild diffuse disc bulging and endplate spurs that effaced the ventral portion of the thecal sac as well as moderate hypertrophy and mild to moderate lateral recess and neural foraminal stenosis at L4-5; and, at L5-S1 mild disc bulging and marked hypertrophy of the facet joints. (PageID 630-631).

Plaintiff underwent a psychological evaluation by Stephen Hardison, a mental health therapist, on February 16, 2009, at the request of the State agency. Plaintiff lived with her sister in Tennessee. She was divorced and had a grown son and daughter. (PageID 376). She had symptoms of feeling nervous when in significant pain or when under stress and a need to leave the situation as soon as possible. She sometimes felt disoriented. She had problems with concentration, forgetfulness, and sleeping. She

frequently got up during the night. During the day she had breakfast and then took a shower. She went with her sister to the store once or twice a week. She mostly watched television. She sometimes went to the park and the restaurant at the park. She stayed in touch with her cousin and talked with her children twice a week on the phone. She did not cook, but might fix a sandwich. Her sister did the household chores, but Plaintiff helped fold clothes and sometimes made her bed. She sat on the porch. She no longer read because of concentration problems. (PageID 377). Plaintiff was diagnosed with anxiety disorder NOS. She had the ability to remember and carry out simple one and two-step instructions. She was mildly to moderately limited in her ability to sustain concentration and persistence for extended periods due to stress. Her ability to complete work tasks without interruption was mildly to moderately limited if under regular stress. She was mildly limited in her ability to relate to others and her ability to use judgment in a structured work setting was mildly limited. (PageID 379).

The record was reviewed on March 9, 2009 by Dr. Burger, a non-examining psychologist, at the request of the State agency. She opined that Plaintiff had a mild restriction in her daily activities and a moderate restriction in her social functioning. She had a moderate restriction in her ability to maintain concentration, persistence, or pace. (PageID 395). Dr. Burger stated, "MER are consistent in indicating CL has anxiety symptoms with physiological expression of them which are exacerbated by pain. CL is moderately limited in CPP and understanding due to MH sx and pain/pain treatment and has mild to moderate limitation is social interactions and adaptation related to MH sx." (PageID 397). Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended

periods; complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (PageID 399-400). Plaintiff was found to be able to understand and remember simple and detailed tasks and sustain concentration for simple and detailed tasks "despite periods of increased signs and symptoms." (PageID 401). Plaintiff would "experience some but not substantial difficulty interacting with the general public, supervisors, and co-workers." *Id.*

Plaintiff was seen in treatment at Focus Care from December 29, 2009 through September 13, 2010. She underwent an Adult Diagnostic Assessment on December 29, 2009. She was living with her daughter and her two year old grandson. Worker's Compensation had refused to pay for more back surgery after her failed back surgery. (PageID 580). The diagnoses were major depression, moderate and single episode, and general anxiety disorder. Her GAF was 55.[2] (PageID 589). On January 5, 2010, Plaintiff reported nightmares concerning her abuse from her first husband. She also had flashbacks which had increased after his death in May 2009. Her diagnosis was updated to include PTSD, chronic with delayed onset. (PageID 578). She was observed to be anxious, crying, stressed, frustrated, and depressed during sessions. (PageID 449,

---

[2] The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults. A score of 51-61 indicates moderate symptoms (*e.g.*, depressed mood and mild insomnia) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

553-559. 561-562, 567-575, 577).  She underwent an initial psychiatric evaluation on

April 8, 2010.  (PageID 563).  She was depressed, anxious, and had a constricted affect.

She had a "[m]arked loss of drive and motivation, lack of interest in self and her

surroundings, feeling of depression."  (PageID 565).  The diagnosis was major depressive

disorder, recurrent, and anxiety disorder NOS.  Her GAF was 48.[3]  (*Id.*)  She was

prescribed medication for anxiety, depression, and insomnia and it was recommended

that she be taught coping skills.  (PageID 566).

**B.**

First, Plaintiff alleges that the ALJ erred in rejecting the opinion of her treating

physician.

Specifically, Plaintiff alleges that the ALJ erroneously substituted his opinion for

that of a competent medical source, because he did not give controlling weight to Dr.

Hendi's 2009 or 2010 assessments.  However, a treating source's medical opinion is only

entitled to controlling weight if it is both well-supported by medically acceptable clinical

and laboratory diagnostic techniques and is not inconsistent with other substantial

evidence in the record.

The Regulations clearly state that a treating doctor's opinion must be given

"controlling weight" if "well-supported" by objective evidence.  20 C.F.R. § 1527(d)(2).

More weight is generally given to treating sources because they can provide a detailed,

longitudinal picture of one's medical impairments and may bring a unique perspective to

the medical evidence that cannot be obtained from objective findings alone or from

---

[3]  A score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).

reports of individual examinations such as consultative examinations. *Id.* "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors – namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (discussing 20 C.F.R. § 1527(d)(2)).

If an ALJ rejects the opinion of a treating physician, he must articulate clearly "good reasons" for doing so. *Wilson*, 378 F.3d at 544. In order to be "good," those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. In fact, the Sixth Circuit has held that the ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007).

Ultimately, the ALJ determined that Dr. Hendi's reports were neither supported by nor consistent with the objective evidence. (PageID 98). In her December 2009 assessment, Dr. Hendi opined that Plaintiff could do light work with additional marked limitations in postural activities and additional lifting limitations to five pounds. (PageID 528-29). The ALJ noted that Dr. Hendi did not provide much explanation in this assessment. (*Id.*) An ALJ may properly discount a treating physician's findings based

solely on the fact that the physician fails to explain any objective basis for the stated limitations. *Morgan v. Astrue*, No. 10-299, 2011 U.S. Dist. LEXIS 94841, at *8 (S.D. Ohio July 20, 2011) (ALJ reasonably did not give controlling or substantial weight to treating psychiatrist's opinion where his opinion that claimant had marked restrictions "appears in boxes he checked without any supporting explanation or reference to medical evidence."). *See also McClanahan v. Comm'r of Soc. Sec.*, 1:09cv746, 2011 U.S. Dist. LEXIS 15599, at *12 (S.D. Ohio Feb. 16, 2011) ("the essential problem with the four pages of forms that make up [the doctor's] opinion is that it is entirely conclusory. Other than stating that his observations are based on physical exams and history, [the doctor] gives no indication of what evidence his opinion is based on"). In fact, Dr. Hendi checked a box on the 2009 assessment form, indicating that Plaintiff was "[u]nemployable," yet she did not support such a determination either by the limitations she checked on that same form or by any written "detailed findings." (PageID 528-29). Moreover, the issue of whether Plaintiff is "unemployable" is reserved to the Commissioner and a physician's opinion on the issue is never given controlling or deferential weight. *See* SSR 96-5p.

Six months later, in June 2010, and with no clear explanation, Dr. Hendi opined that Plaintiff could not perform even sedentary work. (PageID 622-26, 532-41). The ALJ noted that Dr. Hendi's June 2010 assessment was based in part on Plaintiff's reported anxiety and in part on Plaintiff's claims of back pain with physical activity. (PageID 624). Thus, the ALJ properly concluded that the opinion relies on Plaintiff's subjective complaints and is not based on objective observations. (PageID 98) ("the tenor of [Dr. Hendi's] assessments is that she relies on [Plaintiff's] subjective complaints

and [has] very little in the way of objective basis for assessing [Plaintiff's] degree of functioning"). *See Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data."). Dr. Hendi declined to even attempt to support her opinion, instead stating that Plaintiff "needs to be seen by pain specialist." (*Id.*) In fact, Dr. Hendi states that she "would need [the specialists'] opinions" in order to support her opinion. (*Id.*) However, Dr. Hendi's only support for the listed limitations is to state that "pain is subjective and per [Plaintiff's] report she is in pain all the time." (*Id.*)

Furthermore, the ALJ is not bound by the disability opinion of a treating physician who provides conflicting opinions throughout the relevant time period, particularly when the treating physician provided no explanation for such contradictions. *Hardaway v. Sec'y of HHS*, 823 F.2d 922, 927 (6th Cir. 1987). Dr. Hendi gave no explanation as to why her assessment of Plaintiff's RFC changed so drastically since December 2009. (PageID 622-26, 532-41). Moreover, Dr. Hendi does not specialize in such areas, in fact she "is not an orthopedic specialist, surgeon, or neurologist." (*Id.*) *See* 20 C.F.R. § 404.1527(d)(2)(ii).

Plaintiff maintains that the diagnostic evidence and Dr. Hendi's treatment notes support his opinions. However, Dr. Hendi simply points to evidence of the existence of impairments – which the ALJ credited and evidence of her subjective complaints. Plaintiff's argument only bolsters the ALJ's conclusion that Dr. Hendi relied on Plaintiff's subjective complaints. This is further supported by a review of Dr. Hendi's treatment notes, which do not reflect the limitations set forth in either opinion. (PageID

519-47).  For example, in August 2009, Plaintiff "states that she is functioning well with medication," which belies an assessment of total disability.  (PageID 524).  Additionally, in March 2010, Dr. Hendi found "normal range of motion, no tenderness, no bony tenderness, no swelling, no edema, no deformity, no laceration, no spasm and normal pulse."  (PageID 521).  The ALJ may properly reject the opinion of a treating source "where the treating physician's opinion is inconsistent with [her] own medical records." *Driggs v. Astrue*, No. 11-229, 2012 U.S. Dist. LEXIS 7994, at *6 (S.D. Ohio Nov. 29, 2011).

Additionally, Dr. Hendi's assessments are contradicted by other evidence in the record, such as specialist Dr. Gilliotte's 2010 treatment notes.  (*See* PageID 98, 628-29). Dr. Gilliotte described a physican exam that was mostly "normal," and he did not find any serious condition and recommended conservative care.  (*Id*.)  Additionally, Plaintiff did not show any significant effort in pursuing recommended non-narcotic treatment for her pain, such as physical therapy, and her activities of daily living also contradicted Dr. Hendi's opinion.  (PageID 98, 608-09).

The ALJ further considered other, contrary opinion evidence, such as the opinion of the reviewing physician, Dr. James Millis.  *See* 20 C.F.R. § 404.1527(d)(4).  Dr. Millis assessed a reduced range of medium work and an RFC that was even less restrictive than what the ALJ assessed.  (PageID 98).  However, the ALJ did consider Dr. Millis's opinion and determined that, due to additional evidence Plaintiff submitted that Dr. Millis did not get to review, she would give the benefit of the doubt to Plaintiff's subjective complaints "to the extent of reduced range of light work."  (*Id*.)  The ALJ properly considered Dr. Millis's opinion and, as the fact finder, properly made the determination

to reject the limitations set forth therein.  *See Bender v. Comm'r of Soc. Sec.*, No. 10-772, 2011 U.S. Dist. LEXIS 96774, at *2 (S.D. Ohio Aug. 29, 2011) (the ALJ and not the court is responsible for resolving conflicts between medical evidence).

The ALJ also discounted Dr. Hendi's opinion regarding Plaintiff's mental limitations.  The ALJ reasonably found that Dr. Hendi's mental assessment lacked support in the record.  Dr. Hendi's opinion with regard to Plaintiff's mental limitations is inconsistent with her own medical notes.  For example, according to Dr. Hendi's notes, in August 2009, Plaintiff  was "functioning well with medication," (PageID 524) and her anxiety is stable with medication (PageID 523).  In March 2010, Dr. Hendi notes that while Plaintiff is positive for back pain and depression, she "is not nervous/anxious and does not have insomnia."  (PageID 521).  Dr. Hendi adds that Plaintiff's depression is "improved" and her anxiety is "control[led] with medication."  (PageID 522).  However, in her June 2010 assessment, Dr. Hendi notes without explanation that Plaintiff experiences marked limitations in functioning.  (PageID 540-41).  An ALJ may properly discount the weight assigned to a treating source's medical opinion when it is internally inconsistent or contradicts that source's own records and notes.

Dr. Hendi's opinion with regard to Plaintiff's mental limitations is also inconsistent with other medical source opinions.  The ALJ properly considered the opinions of examining psychologist Mr. Hardison and reviewing psychologist Dr. Burger (PageID 95) and found that Dr. Hendi's assessment of "marked" mental limitations was inconsistent with both.  (PageID 96).  For example, the ALJ noted that Dr. Hendi had assessed marked limitations in social functioning (PageID 95) but noted that Mr. Hardison, the examining psychologist, assessed no significant problem in this category.

(PageID 96).  Additionally, the record indicates Plaintiff was "cooperative," that there was "no evidence or rudeness or aggression toward others," and that she is close to family members and goes out as needed.  (*Id*.)  However, the ALJ acknowledged that Dr. Burger assessed moderate restrictions in this category and noted significant anxiety issues per the treatment records.  (*Id*.)  The ALJ gave the benefit of the doubt to Plaintiff and adopted the more restrictive finding that Plaintiff had "moderate difficulties" in the area. (*Id.*)

Dr. Hendi's opinion with regard to Plaintiff's mental limitations is also inconsistent with Plaintiff's reported daily activities.  (PageID 96, 98).  While Dr. Hendi again indicated marked limitations in this area (PageID 95), the ALJ found that Plaintiff had only mild restrictions in her activities of daily living.  (PageID 96).  She described in detail Plaintiff's reported activities, and also indicated that "[t]here is no evidence of significant restriction in this category due solely to mental impairment."  (PageID 96).

Additionally, Dr. Hendi is not a mental health specialist and "her records do not show any detailed observations or discussions with [Plaintiff] as to mental health issues even though [Dr. Hendi] prescribed medication at that time."  (PageID 95-96).  Dr. Hendi herself stated that Plaintiff would have to be seen by psychiatry to assess Plaintiff's mental impairment, although she also circled the boxes for "marked" impairments of mental functions.  Even if Dr. Hendi's opinion had not been inconsistent with the other evidence in the record, the ALJ properly exercised her discretion to discount its weight because the subject matter of the opinion was outside Dr. Hendi's area of expertise.  *See, e.g., Ritchie v. Astrue*, 3:10cv152, 2011 U.S. Dist. LEXIS 33041 (S.D. Ohio Mar. 11,

2011) (opinion from claimant's primary care physician not entitled to controlling weight because doctor was not a mental health expert).

Accordingly, substantial evidence supports the ALJ's decision not to give Dr. Hendi's opinion controlling weight.

## C.

Next, Plaintiff alleges that the ALJ erred in failing to find that she was credible.

The ALJ concluded that Plaintiff's allegations were not entirely credible. Specifically, the ALJ found that: (1) Plaintiff's alleged pain was inconsistent with the evidence; (2) there was no objective evidence supporting several of Plaintiff's allegations of physical limitations; (3) her alleged symptoms were inconsistent with statements she made to her doctors; (4) she was involved in a contemporaneous worker's compensation claim, and her desire to gain from worker's compensation may explain why the record simply does not support "serious incapacitation consistent with disability for Social Security purposes," and (5) there was evidence of drug-seeking behavior.  (PageID 99). "The ALJ's credibility determinations are entitled to great deference because the ALJ has the unique opportunity to observe the witness's demeanor while testifying." *McFlothin v. Comm'r of Soc. Sec.*, 299 F. App'x 516, 523 (6th Cir. 2008).

The ALJ may discount Plaintiff's subjective allegations of pain when the medical evidence does not support them. *McDonald v. Comm'r of Soc. Sec.*, No. 09-860, 2011 U.S. Dist. LEXIS 20698, at *26 (S.D. Ohio Jan. 10, 2011) ("Because the severity of Plaintiff's reported level of pain was not supported by any medical evidence, it was proper for the ALJ to discount the credibility of her account").  Indeed, objective medical evidence is highly relevant to whether a claimant suffers from disabling pain. *Daniels v.*

22

*Comm'r of Soc. Sec.*, No. 10-760, 2011 U.S. Dist. LEXIS 57275, at *4 (S.D. Ohio May 26, 2011) ("Contrary to plaintiff's argument, normal neurological findings or other results of objective testing are not completely unrelated to whether a claimant suffers from disabling pain; 'as a practical matter, in the assessment of credibility, the weight of the objective medical evidence remains an important consideration."). While pain may be the basis for a disability finding, Plaintiff's subjective claims of disabling pain, by themselves, do not require the ALJ to find that she is disabled.

Additionally, some of Plaintiff's alleged physical limitations are simply not supported by any evidence in the record. For example, although Plaintiff claims that "her legs give out on her," there is no evidence in the medical record. The ALJ also notes that some of Plaintiff's alleged symptoms are inconsistent with statements that she has made to her doctors. (PageID 99). For instance, Plaintiff claims that her insomnia caused her sleep to be broken and she had to nap several times per week, yet Plaintiff told her psychiatrist that her medication helped her sleep and there is no evidence that she was medically advised to nap. (*Id.*)[4]

Plaintiff maintains that the ALJ improperly relied on Plaintiff's daily activities and insinuates that this was the sole basis for the ALJ's credibility finding. However, the ALJ gave valid reasons for finding her to be less than credible. Plaintiff also argues that the ALJ considered her contemporaneous worker's compensation claim, concluding that Plaintiff's allegations of disabling pain might be related to secondary gain. However, "it

---

[4] The ALJ did not base her finding of "not disabled" solely on the fact that "[t]here is no evidence that [Plaintiff] has been medically advised to take naps or recline for four hours a day." (PageID 99). Rather, the ALJ properly included this observation in her negative credibility analysis.

is within the Administrative Law Judge's jurisdiction to consider other income sources [worker's compensation] and secondary gain in determining credibility." *Brown v. Comm'r of Soc. Sec.*, 1 F. App'x 445, 452 (6th Cir. 2001).

Moreover, Plaintiff fails to address that several of the doctors who prescribed her narcotic pain medication later terminated her as a patient or refused to continue prescribing pain medication due to concerns about her drug abuse. The medical evidence is in fact replete with doctors noting concerns over Plaintiff's drug seeking behavior and possible drug dependence. (PageID 93, 95, 99-100).[5] Substantial evidence supports the ALJ's conclusion that Plaintiff may have sought care not for pain, but in order to obtain narcotics.

While Plaintiff may disagree with the ALJ's decision, her decision is clearly within the "zone of choices" afforded to her. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) ("The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes that there is a zone of choice within which the decision makers can go either way, without interference."). The issue is not whether the record could support a finding of disability, but rather whether the ALJ's decision is supported by substantial evidence. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). Accordingly, the undersigned finds that the ALJ's decision is supported by substantial evidence.

---

[5] PageID 450 (terminating Plaintiff as a patient due to drug seeking behavior and noting that she had five prescriptions for Vicodin from five different doctors), 351-53 (noting he would only give Plaintiff a reduced number of pain pills for the next two or three months and stating that "any more questionable incidents will lead us to immediately stop all prescribing"); 443 (diagnosing acute Ativan withdrawal upon presentation at the emergency room); 357-59 (refusing to write further prescription and describing "[m]any inconsistencies regarding medication." Including a "phone call from person claiming to be patient when actually it was her sister"); 422-24 (listing Plaintiff as an "addiction risk").

### III.

For the foregoing reasons, Plaintiff's assignments of error are unavailing.  The ALJ's decision is supported by substantial evidence and is affirmed.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that Rhonda Molen was not entitled to disability insurance benefits and supplemental security income, is found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**; and, as no further matters remain pending for the Court's review, this case is **CLOSED**.

Date:  7/1/13                                     *s/ Timothy S. Black*
                                                  Timothy S. Black
                                                  United States District Judge